**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JUAN JOSE CASTRO, | § | |
| (Reg. #14441-179) | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-05-0002 |
| | § | |
| HARRIS COUNTY JAIL, *et al.,* | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM AND OPINION

Juan Jose Castro, a federal inmate,[1] sued in January 2005, alleging that he was denied medical care while he was a pretrial detainee at the Harris County Jail ("HCJ"). Castro, proceeding *pro se* and *in forma pauperis*, sues Tommy Thomas, the Sheriff of Harris County; the HCJ; the Harris County Medical Department; the LBJ Hospital, which provides care for HCJ inmates; Dr. Esteban Lopez, a contract physician for the HCJ; and Jane Does 1-5 and John Does 1-5, officers and employees at the HCJ and LBJ Hospital. Castro asks that Dr. Michael M. Seale be substituted as one of the John Doe defendants. (Docket Entry No. 22, Castro's Response, p. 17).

After Castro filed a more definite statement describing his claim, (Docket Entry No. 9), this court ordered service on Sheriff Tommy Thomas and Dr. Lopez. (Docket Entry No.

---

[1] In 2003, Castro was convicted on a guilty plea of cocaine trafficking. On August 23, 2003 he was sentenced to 108 months in federal prison.

10). Sheriff Thomas answered and filed a motion for summary judgment. (Docket Entry No. 19). Counsel for Sheriff Thomas has advised the court that Dr. Lopez is not employed by the HCJ. Dr. Lopez has apparently been served but has not answered or filed a dispositive motion.

Based on the pleadings, Sheriff Thomas's motion and Castro's response, the record, and the applicable law, this court grants Sheriff Thomas's motion for summary judgment and dismisses this case. The reasons for these rulings are stated in detail below.

## I.   Background

### A.   Castro's Allegations

On December 4, 2002, Castro was arrested on federal charges and placed in the HCJ. Castro claims that although the HCJ medical department examined him, they gave him the wrong blood pressure medication and failed to give him proper treatment for his diabetes. Castro alleges that on January 3, 2003, he was examined by the HCJ medical department after he complained of extremely high blood pressure and high blood sugar. Due to the severity of Castro's symptoms, HCJ medical personnel transported Castro to the LBJ Hospital. Castro alleges that he waited at the LBJ Hospital for four hours and was then given two pills and returned to the HCJ early on January 4, 2003.[2]  Later that day, Castro experienced numbness in his arms and legs and a severe headache. He complained and was taken to the HCJ clinic in a wheelchair. The nurse checked Castro's blood pressure but

---

[2] From the pleadings, it appears that Castro meant to write January 4, 2003, not January 3, 2003.

refused to give him medical care. Castro alleges that the guards called Dr. Lopez, who said that he was sleeping and would not see Castro at that time. Castro alleges an eleven-hour wait to see a doctor. He does not specify when the eleven hours began or ended. Castro alleges that at approximately 11:00 p.m. on January 4, 2003, he was taken to a holding cell. Castro alleges that the medical department authorized him to be placed in the holding cell overnight. (Docket Entry No. 9, Plaintiff's More Definite Statement, p. 2). Castro alleges that while he was in the holding cell, he told the jailers that his condition was worsening, but the guards did not take him to see medical personnel.

Castro alleges that Dr. Lopez did not see him for hours. Castro alleges that by then, he had suffered a stroke. Castro was transported by ambulance to the LBJ Hospital on January 5, 2003 at 6:36 a.m. He remained in the hospital for three days.

Castro was returned to the HCJ on January 8, 2003. He was placed in the general population of the HCJ. Castro alleges that in general population, he had trouble sleeping on the cold floor and getting up to take his meals. Castro asserts that the stroke resulted in a loss of 50% of the strength on his right side, with weakness in his right arm and leg. Castro complains that he cannot walk easily and has a tendency to fall.

Castro alleges that HCJ caused the stroke by denying him necessary medical care. Castro asserts that the HCJ should have provided him with different medication to lower his blood pressure and blood sugar. (Docket Entry No. 9, Plaintiff's More Definite Statement, p. 4). Castro alleges that he should also have been prescribed insulin. He states that when

he began his incarceration at the HCJ on December 4, 2002, he told medical personnel that he had used insulin for the past fifteen years.

Castro states that he was seen approximately fifty times from December 2002 to November 2003. (Docket Entry No. 9, Plaintiff's More Definite Statement, p. 7). However, he alleges that in addition to the problems receiving medical care before his stroke, in February 2003, medical personnel refused to give him physical therapy for his right arm and leg. Castro complains that he has been charged over $8,000 for medical expenses at the HCJ and LBJ Hospital.

Castro alleges that the failure to provide him proper medical care and proper housing denied him due process, in violation of the Fifth and Sixth Amendments. He complains that Sheriff Thomas failed to take measures to stop the denial of medical care and improper housing. Castro seeks a declaratory judgment that the HCJ's physical abuse violated the Eighth Amendment and that the denial of proper housing violated the Fifth and Fourteenth Amendments. He also alleges negligence under state law.

Castro also seeks damages, as follows:

(1)   compensatory damages of $1,000,000.00 from the HCJ medical department and LBJ Hospital; $500,000 from the HCJ and Sheriff Thomas; $100,000 from LBJ Hospital, Dr. Lopez, and the HCJ Medical Department; and

(2)      punitive damages of $500,000 from the HCJ medical department and LBJ

Hospital; $250,000 from the HCJ and Sheriff Thomas; and $50,000 from LBJ

Hospital, Dr. Lopez, and the HCJ Medical Department.

Sheriff Thomas moves for summary judgment as to all Castro's claims.

**B.      The Summary Judgment Evidence**

Sheriff Thomas has provided copies of certain policies from the Harris County

Sheriff's Department Health Services Policy and Procedure Manual that relate to the

provision of health care services to inmates, as well as Castro's medical records and

affidavits from witnesses who reviewed and summarized their contents.

*1.      The HCJ Policies for Medical Care to Inmates*

**Policy J 30** describes the process for screening newly admitted inmates and providing

them with proper medical care.  A properly trained nurse is to screen a newly admitted

inmate.  All inmates must have a chest X-ray to screen for tuberculosis, unless that inmate

was released from the HCJ less than 90 days before and had a chest X-ray then.  Inmates not

in need of medical intervention are questioned about their medical conditions and history.

An abnormal response to the screening questionnaire administered by health personnel

necessitates further evaluation in the second floor clinic at 1301 Franklin.  If an inmate has

a medical problem or is on medication, the inmate is housed at 1301 Franklin until after a 14-

day physical assessment.  (Docket Entry No. 19, Sheriff Thomas's Motion for Summary

Judgment, Ex. 1, pp. 2-4).

**Policy J 33** describes the process for a more detailed assessment of an inmate's health. Each inmate's health must be assessed within 14 days of arrival at the HCJ. The detailed health assessment is to include review of the initial findings; the collection of additional data to complete the health assessment; laboratory and other diagnostic tests to detect communicable diseases as determined by the physician; a physical examination by an RN; initiation of therapy and immunizations when appropriate; a mental status/mental retardation assessment by an RN, with referral to MHMRA if indicated; and screening examination of the teeth and gums. The completed health assessment and nursing actions are to be reviewed and approved by a physician. Health assessments are repeated annually for inmates staying that length of time. (Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 2, pp. 2-3).[3]

**Policy J 29** addresses inmates requiring hospitalization. An inmate requiring hospitalization will be transferred to a hospital in the Harris County Hospital District on written order of a physician. A physician from the Harris County Sheriff's Department

---

[3] **Policy J 01** provides that the onsite medical director, a physician, is responsible for all health care services. **Policy J 02** provides that the Medical Services Bureau is responsible for providing health care to inmates. Matters of medical, dental, or psychiatric judgment are the sole province of the responsible medical professional. (Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 7, pp. 2-3).

**Policy J 04** provides the process for review of the Harris County Sheriff's Department Policy and Procedure Manual. (Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 7, p. 5).

**Policy J 05** provides a system of quality control and quality improvement for the Medical Services Bureau of the Harris County Sheriff's Department. **Policy J 07** describes the procedure for efficient, humane handling of inmates with special medical or psychiatric needs. (Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 7, pp. 7, 10).

Medical Services bureau reviews all recommendations from the Harris County Hospital District on the inmate's return to the HCJ.  The HCSD may arrange for medical care in a private clinic or hospital for services not provided by the Medical Services Bureau or the Harris County Hospital District.  (Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 7, p. 12).

**Policy J 31** provides procedures for explaining to inmates how to gain information on the availability of health care services.  A standard medical request form is available to inmates in all housing areas.  The completed request form must be placed in the medical request box in the housing area.  Inmates may orally communicate their medical needs to medical personnel or jailers on the floor.  (Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 7, p. 13).

**Policy J 34** describes the procedure for responding to inmate health complaints.  Sick call requests are to be addressed within forty-eight hours of receipt.  Sick call requests are reviewed daily for urgent problems.  An inmate requiring immediate care is to be brought to the clinic as soon as possible.  (Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 7, pp. 14-15).

### 2.    *Castro's Medical Records*

Sheriff Thomas has also submitted copies of Castro's medical records from the HCJ and the LBJ Hospital and affidavits from Bobby Davis and Dr. Michael Seale summarizing the records.  Bobby D. Davis has worked for the Harris County Sheriff's Department since

1989. He is the Medical Administrator for the Department. Davis previously served in the Sheriff's Department as Director of Nursing. Before that, he was Specialty Clinic Supervisor. He is a registered nurse licensed in the State of Texas. He has completed a Master of Science degree in Health Administration and a Bachelor of Science degree in Nursing and is a Certified Corrections Health Care Professional.

Davis, who often reviews Sheriff's Department records on inmates' medical care, reviewed Castro's records of treatment at the HCJ and the LBJ Hospital. Davis summarized the records, as follows:

> 4. A medical evaluation was done of the plaintiff on December 5, 2002 when he first entered the Harris County jail by a physician, Dr. Z. Siddiqi, M.D. At the evaluation Castro reported that he had diabetes and high blood pressure. This was confirmed when a check of his blood sugar ratio showed "286" and his blood pressure reading was 199/112, which is considered high. Castro stated he took a prescription medication called Glucophage for his diabetes and that he could not remember the name of his blood pressure medications. He also said he had not taken his medications for two days.
>
> In response to this initial evaluation prescription medication was given to Castro for these medical problems. Clonidine was prescribed for his high blood pressure at the rate of 0.1mg. daily three times a day for thirty days and Glucophage for diabetes was prescribed at the rate of 500 mg. daily three times a day for thirty days. Additionally blood pressure checks were ordered every day for three days.
>
> On December 8, 2002 his blood pressure had gone down slightly to 175/100. On December 10, 2002 his blood pressure measurements were reviewed by a physician. On December 13, 2002 a written health assessment was made of him by Dr. Guice, M.D. This assessment indicated that he had diabetes and high

blood pressure. After a review by Dr. Guice of his recent blood pressure checks additional blood pressure checks were ordered December 14 through 17, 2002. His blood sugar ratio was also ordered to be checked on these same days. On December 24, 2002 he was again evaluated by a physician. As a result of this evaluation his dosage for Clonidine and Glucophage was doubled.

Four days later Castro was again examined by a physician on December 28, 2002. His blood pressure was shown as 180/95. In order to try to reduce his blood pressure, the Clonidine was discontinued and a new medication, Quinapril, was added. A stat does of Clonidine and Quinapril was ordered and given to Mr. Castro. On January 3, 2003 the Plaintiff complained of numbness in part of his body. He was examined by a nurse who then referred him to a physician. The physician stated that Castro complained to him that he had been bothered by numbness and weakness in his right arm and right leg. He did not report any headaches. The doctor conducted a neurological examination of the vertebrae in his neck (CN 2-12) which was not found to be the cause of the numbness and weakness. Right arm and right leg raising tests were performed and he was found to be slightly deficient with right sided weakness. As a result of this evaluation he was transferred to LBJ hospital. He was discharged the same day and returned to the HCSO in the early hours of January 4, 2003. While at LBJH he was given a CT scan of his brain but it did not show a brain hemorrhage. He was transferred back to LBJ on January 5, 2003. While at LBJ hospital he was diagnosed as having had a stroke also known as a CVA (cerebrovascular accident). He was at LBJ hospital through January 8. While in LBJ he was started on a special diet for persons with diabetes and high cholesterol. He was also given physical therapy and provided with a walker. During this time period he was taking approximately six different medications for his various ailments. These medications were as follows:

1.   Glucophage for diabetes
2.   Accupril for high blood pressure
3.   Clon[i]dine for high blood pressure

  4.  ECASA for heart attack prevention
  5.  Plavix for heart attack prevention
  6.  Clindamycin for a skin infection

On January 9, 2003 the Plaintiff refused any medical treatment at all.  On January 16, 2003 he was seen by a physician who stated that did not find any new medical problems.  Some of his medications were increased however.

On February 4, 2003 blood pressure checks and finger sticks were j ordered for February 7 through February 10.  He was evaluated by a medical doctor on February 5, 2003.  On February 24, 2003 his medications were renewed.  During the February 5, 2003 evaluation, the medical doctor did not see any new medical problems and continued to treat him for high blood pressure and diabetes.

A complete and detailed summary of the medical treatment given to the Plaintiff while at the Harris County jail (from December 5, 2002 through October 28, 2003) was prepared by me and is attached to this affidavit as Ex. A.[4]  The summary shows that he was examined or treated by medical personnel approximately 80 times from December 5, 2002 through October 21, 2003.  This is approximately seven times a month during the period he was at the Harris County jail.

In addition, I have also prepared a complete summary of the medications Mr. Castro was taking, and the dates and times he was taking the medication, and attached it to this affidavit as Ex. B. The chart indicates that approximately 8 different medications were given to him during the time he was at the jail.

(Docket Entry No. 21).

  In his affidavit, Michael M. Seale, M.D., states that he is currently employed by the

Harris County Sheriff's Office as the Executive Director for Inmate Health Services.  He is

---

  [4] The court has included this summary as an appendix to this Memorandum and Opinion.

a physician licensed in the State of Texas. He regularly reviews records of the Harris County

Sheriff's Office pertaining to medical care received by inmates. Dr. Seale summarized his

review of Castro's records, as follows:

> 3. By training and by experience, I am qualified as an expert in
> the field of medicine and my expertise includes knowledge of
> the duties and appropriate decision-making process of
> physicians and also licensed nursing personnel in Harris County,
> Texas.

> 4. The physicians working at the Harris County Jail are doctors
> employed by the University of Texas Health Science Center at
> Houston and are not employees of Harris County or of the
> Harris County Jail. They are fully licensed and certified to
> practice medicine in the State of Texas. In addition, the doctors
> working at LBJ Hospital are not employees of Harris County.

> 5. I have reviewed the medical records of Juan Jose Castro
> while he was at the Harris County Jail which were filed in this
> lawsuit as a business records affidavit (Ex. 3). I have also
> reviewed the medical records of Juan Jose Castro while at LBJ
> Hospital which were filed in this case as a business records
> affidavit. (Ex. 4). Both business records affidavits are
> incorporated herein by reference. I have also reviewed the
> affidavit prepared by Bobby Davis for this lawsuit and that
> affidavit is incorporated herein by reference.

> 6. When Mr. Castro, a forty-nine year old male, was first
> admitted to the Harris County Jail on December 5, 2002 he was
> found to be suffering from high blood pressure and diabetes.
> His medical records indicated he had a ten year history of high
> blood pressure and diabetes. During his stay at the Harris
> County jail these were continuing medical problems for him. It
> is not unusual for a person his age to be suffering from these
> diseases. He also stated that he had discontinued his medication
> to treat elevated cholesterol six months prior to incarceration.
> He was however provided medical treatment for these problems.
> The treatment he was provided included, among others,

medication to lower his blood pressure, to reduce his cholesterol level, and to treat his diabetes.  His blood pressure and blood sugar levels were monitored frequently.  He was also placed on a special diet and given physical therapy as part of this treatment.

The records from LBJ Hospital indicate he did have a stroke (cerebrovascular accident) sometime in early January. However nothing in the records indicates that his stroke was directly caused by anything that happened to him at the jail. His medical conditions were appropriately noted, treated and followed. Medication and other treatment regimens were adjusted in an effort to control his chronic medical conditions. That treatment, or alleged lack thereof, did not directly cause his stroke.  In my opinion, given the fact that he had a long history of high blood pressure and diabetes when he was admitted into the jail, his stroke may well have occurred regardless.   Once he was diagnosed with having a stroke, appropriate medical care was continued for this condition.

7.  Based on my review of Inmate Castro's medical records, Castro was evaluated on multiple occasions by various physicians and nurses at the Harris County Jail and at LBJ Hospital.  Based on those individual evaluations, appropriate tests were performed, appropriate medications were prescribed, and appropriate treatment given to him.

8.  There is no indication in the medical record that Castro was denied care at LBJ Hospital on January 3, 2003.  According to the Emergency Room Triage Record, he was seen and even received a CT scan of the brain.

9.  There is no indication in the medical record that Castro was denied care on January 4, 2003.  He was assessed by a nurse and then by a physician and after that evaluation was sent to the LBJ Hospital Emergency Room. The medical record does not reflect a 12-hour wait to see the physician.

10.  In my opinion, there is nothing in the medical records to indicate that Castro failed to receive any necessary medical care

in the jail for any medical condition of which he complained. When he first complained of symptoms indicating he might be having a stroke he was evaluated by medical personnel and transferred to LBJ Hospital for more extensive evaluation and treatment.

11.   During the multiple physician evaluations following Castro's return from LBJ Hospital on January 8, 2003, he made no complaint of 'physical abuse' or for a need for housing other than general population.   Upon his return from the hospital, Castro was transferred to the general population cellblock with appropriate accommodations for physical handicaps.  Infirmary admission is based on the judgment of the individual physicians following their evaluations of individual patients.  During those evaluations, the physicians could have admitted Castro to the Infirmary if they felt he would have benefitted from such a transfer.  In fact, that did occur and Castro was admitted to the Infirmary from March 6, 2003 until April 1, 2003.

12.  In my opinion, Castro was not denied reasonable medical treatment for the medical problems he was having.  Based on the documentation in the medical records, the health care providers at the Harris County Sheriff's Office were not deliberately indifferent to Castro's medical problems and he received appropriate and adequate medical care at all times in the jail.

13.  All my opinions expressed in this affidavit are based on my training and experience as a medical doctor and my review of the relevant records, and are based on reasonable medical probability.

(Docket Entry No. 19, Ex. 6).

Each of Castro's claims is evaluated below.

## II.   The Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners,* 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986), *cert. denied,* 484 U.S. 1066 (1988)).

After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986); *Beck,* 204 F.3d at 633; *Allen v. Rapides Parish School Bd.,* 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company,* 136 F.3d 455, 458 (5th Cir. 1998). Substantive law determines what is material. *Anderson,* 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex,* 477 U.S. at 327.

"Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Federal Savings and Loan, Inc. v. Krajl,* 968 F.2d 500, 503 (5th Cir. 1992). The facts are reviewed drawing all reasonable inferences in

favor of the non-moving party. *Allen,* 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.*, 177 F.3d 351, 161 (5th Cir. 1999); *Banc One Capital Partners Corp. v. Kneipper,* 67 F.3d 1187, 1198 (5th Cir. 1995). However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994); *see Edwards v. Your Credit, Inc*., 148 F.3d 427, 432 (5th Cir. 1998). In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little,* 37 F.3d at 1075 (emphasis omitted).

Castro proceeds *pro se*. Courts construe pleadings filed by *pro se* litigants under a less stringent standard than those drafted by attorneys. *See Haines v. Kerner*, 404 U.S. 519 (1972). Pleadings filed by a *pro se* litigant are liberally construed. *See Haines*, 404 U.S. at 521; *see also United States v. Pena*, 122 F.3d 3, 4 (5th Cir. 1997) (citing *Nerren v. Livingston Police Dept*., 84 F.3d 469, 473 & n.16 (5th Cir. 1996)). Nevertheless, "the notice afforded by the Rules of Civil Procedure and the local rules" is considered "sufficient" to advise a *pro se* party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992); *see also Ogbodiegwu v. Wackenhut Corrections Corp*., 202 F.3d 265 (5th Cir. 1999) (unpublished table opinion) ("Although the pleadings filed by pro se parties are held to 'less stringent standards than formal pleadings drafted by lawyers,' pro se parties must still comply with the rules of procedure and make arguments capable of withstanding summary judgment.").

## III.   The Claim of Deliberate Indifference to a Serious Medical Need

### A.   The Legal Standard

Section 1983 creates a cause of action against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." 42 U.S.C. § 1983 (2000).  Although Congress did not specifically define the statutory term "person" to include counties or similar municipalities, the Supreme Court has held that these entities can be held liable for § 1983 violations. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978) ("Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies.").

Castro claims that Sheriff Thomas deprived him of rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.  "Pretrial detainees and convicted prisoners . . . look to different constitutional provisions for their respective rights to basic needs such as medical care and safety." *Hare v. City of Corinth,* 74 F .3d 633, 639 (5th Cir. 1996) (en banc).  As a pretrial detainee, Castro was covered by the Fourteenth Amendment, not the Eighth Amendment. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc).  However, there is no significant legal distinction between pretrial detainees and convicted prisoners complaining of unconstitutional medical treatment. *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001).

The standards for analyzing a pretrial detainee's claim of constitutional violations depend on whether the claim challenges the conditions of confinement or an episodic act or omission by the jail personnel. *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc). In jail-condition cases, the perpetrator's state of mind is not at issue because the intent is manifest in the challenged condition, practice, rule, or restriction. *See Hare*, 74 F.3d at 644-45. This first category includes such claims as "where a detainee complains of the number of bunks in a cell or his television or mail privileges." *Scott*, 114 F.3d at 53. The wrong of which the detainee complains, the unconstitutional infliction of punishment, is the condition itself. In these cases there is a direct link between the policy supporting the condition and the actual harm suffered by the detainee. *See id.* ("In many jail condition cases, the conditions themselves constitute the harm. This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions."). An episodic-act-or-omission case usually involves a complaint of some unconstitutional act or omission of an individual official, then points to a policy, custom, or rule (or lack thereof) that permitted or caused the violation. *Flores v. County of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997); *Scott*, 114 F.3d at 53. In this second category of cases, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Id.* Episodic act or omission cases, like conditions of confinement claims,

implicate a municipal policy. However, for episodic act or omission cases the policy at issue is one step removed from the individual act or omission that directly caused plaintiff's alleged harm. *See id.* ("[T]he actual harm of which [plaintiff] complains is ... an episodic event perpetrated by an actor interposed between [plaintiff] and the city, but allegedly caused or permitted by the aforesaid general conditions.").

To succeed in holding a municipality liable in an episodic-act-or-omission case, the plaintiff must establish not only that a municipal employee acted with subjective deliberate indifference but also that the employee's act resulted from a policy or custom adopted or maintained by the municipality with objective deliberate indifference to the plaintiff's constitutional rights. *See Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999).

A review of Castro's complaint demonstrates that this case involves allegations of an episodic act or omission. Under *Hare*, this court must examine both the act or omission that allegedly violated the law and the custom, rule, or policy that allegedly permitted the act or omission ("a municipality's liability for that violation"). 74 F.3d at 649 n.4. In *Hare*, the Fifth Circuit described the proper methodology, as follows:

> We separate the two issues: the existence of a constitutional violation simpliciter and a municipality's liability for that violation. Different versions of the deliberate indifference test govern the two inquiries. Our opinion in this case makes clear that to prove an underlying constitutional violation in an individual or episodic acts case, a pre-trial detainee must establish that an official acted with subjective deliberate indifference. Once the detainee has met this burden, she has

proved a violation of her rights under the Due Process Clause. To succeed in holding a municipality accountable for that due process violation, however, the detainee must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the detainee's constitutional rights. *See Farmer [v. Brennan*, 511 U.S. 825, 841, 114 S. Ct. 1970, 1981, 128 L.Ed.2d 811 (1994)] ("It would be hard to describe the *Canton [v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L.Ed.2d 412 (1989)] understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.").

*Id.*

A prison official's "deliberate indifference to serious medical needs of prisoners" can constitute "unnecessary and wanton infliction of pain" of the type proscribed by the Eighth Amendment and actionable under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U .S. 97, 104 (1976). A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required. *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006) (citation omitted). It is "obduracy and wantonness, not inadvertence or error in good faith," that characterizes the conduct prohibited by the Eighth Amendment. *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). "Thus, the prison official's state of mind must be examined to determine whether the undue hardship endured by the prisoner was a result of the prison official's deliberate indifference." *Bradley*, 157 F.3d at 125 (citing *Wilson v. Seiter*, 501 U.S. 294 (1991)).

The deliberate indifference standard has both an objective and subjective component. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prisoner must show that the defendant was both (1) aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn, and (2) that they actually drew an inference that such potential for harm existed. *See Farmer*, 511 U.S. at 837; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). A prison official acts with deliberate indifference "only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it." *Gobert*, 463 F.3d at 346 (quoting *Farmer*, 511 U.S. at 847).

The Fifth Circuit has stated that the deliberate indifference standard is an "extremely high" one to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346 (citations omitted). Furthermore, "the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Id.* A showing of deliberate indifference requires the prisoner to submit evidence that prison officials "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id.* (citations omitted). A review of Castro's allegations and the record of care that he received show that

he fails to demonstrate deliberate indifference. The record includes the documents showing the care that he received at the HCJ and the affidavit from the Jail Clinic Administrator, Bobby Davis, summarizing Castro's treatment records and the policies and procedures for caring for inmate's medical needs. This court analyzes Castro's specific allegations and the summary judgment record of the treatment he received.

**B.      Analysis of the Summary Judgment Evidence**

**1.      December 4, 2002: Castro's Admission to the HCJ**

The HCJ has a policy for interviewing and screening newly arrived inmates to identify their medical needs. Castro had been previously incarcerated in the HCJ. He was last released on August 5, 2002. (Docket Entry No. 22, Castro's Response, p. 2). The medical records show that on December 4, 2002, on arrival at the HCJ, Castro had a blood sugar level of 286 and blood pressure of 199-112. Castro argues that these were signs of danger, including the risk of heart attack. Castro told medical personnel that he did not know which medications he was using. Castro argues that because he had previously been in the HCJ, the medical department should have known his medical condition and medications. Castro alleges that he complained of not having taken his medication, but the HCJ medical personnel made him wait until the following day before getting him medications. Castro argues that this shows deliberate indifference to his medical needs. (Docket Entry No. 22, Castro's Response, pp. 2-3).

The summary judgment evidence shows that in case of a readmitted inmate who has received a documented health assessment within the previous three months and whose intake screening shows no change in health status, the prior record is reviewed and tests and examinations are updated as needed. (Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 2, pp. 2-3). Castro had been released from the HCJ on August 5, 2002, four months before. Because more than three months had elapsed, HCJ policies did not require medical personnel to review Castro's previous medical records. The record shows that Castro received medications on the day after his admission to the HCJ, including medication for high blood pressure and diabetes.

### 2.    December 5, 2002

Castro argues that because both his sugar level and blood pressure were extremely high, this information was an "Abnormal Response" within the meaning of policy J30 (3.10) and should have been immediately addressed by medical staff on the day after his admission. Castro points to HCJ policy number J30, 3.10 which states:

> Any abnormal response to the screening questionnaire administered by health personnel in the book-in area necessitates further evaluation in the second floor clinic at 1301 Franklin. These inmates will have a "Medical" arm band placed on them by the intake screening nurse. They will be escorted to the second floor clinic where their arm band will be removed by medical personnel following evaluation. The positive screening form will print in the Medical Record Department, allowing medical record personnel to retrieve old records if they exist or initiate new records if they do not. This evaluation shall occur prior to classification processing and housing.

(Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 1, p. 4).

Castro was questioned about his current illnesses, health problems, and conditions. Medical personnel evaluated Castro's responses and determined that they did not amount to an "Abnormal Response" under Policy J30. Castro had medical problems and was prescribed medication. There is ample evidence in the medical records that medical personnel monitored Castro's blood pressure, cholesterol, and blood sugar, and prescribed the medications for his conditions. The record shows neither a deviation from HCJ policy nor deliberate indifference.

### 3.    December 5 to 24, 2002

Castro complains that despite readings of high blood pressure and blood sugar and a family history of heart attack and strokes, nothing was done for him until December 24, 2002, when his medication was doubled. (Docket Entry No. 22, Castro's Response, p. 5). The record fails to support this allegation. The summary judgment evidence shows that Dr. Z. Siddiqi performed a medical evaluation of Castro on December 5, 2002. (Docket Entry No. 21, p. 2). At the evaluation, Castro reported that he had diabetes and high blood pressure. This was confirmed by the blood sugar ratio of 286 and blood pressure reading of 199/112. Castro told Dr. Siddiqi that he took a prescription medication called Glucophage for his diabetes but could not remember the name of his blood-pressure medications. Castro also said that he had not taken his medications for two days. In response to this initial

evaluation, Castro was prescribed Clonidine for his high blood pressure and Glucophage for his diabetes. Additionally, blood-pressure checks were ordered every day for three days.

On December 8, 2002, Castro's blood pressure had gone down slightly, to 175/100. On December 10, 2002, a physician again reviewed his blood pressure. On December 13, 2002, Dr. Guice reviewed Castro's recent blood-pressure readings and ordered additional checks from December 14 through 17. Dr. Guice also ordered a check of Castro's blood sugar ratio on the same days. On December 24, 2002, a physician again evaluated Castro. As a result of this evaluation, the dosage for Clonidine and Glucophage was doubled. (Docket Entry No. 21, pp. 2-3). This evidence is inconsistent with a claim of deliberate indifference to medical needs.

### 4.    December 28, 2002

On December 28, 2002, Castro complained of headaches, weakness/numbness of right arm, and alteration in vision. Castro asserts that although he exhibited the classic symptoms of a heart attack or stroke, a physician merely noted "possible neuropath" and changed Castro's blood-pressure medication. (Docket Entry No. 22, Castro's Response, pp. 5, 6, 10). The summary judgment evidence shows that a physician examined Castro on December 28, 2002. His blood pressure was 180/95. To reduce his blood pressure, the physician discontinued the Clonidine and prescribed a new medication, Quinapril, "stat." The evidence shows that when Castro complained, he was examined by a doctor and his medication was promptly adjusted.

### 5.   January 3, 2003

Castro complains that on January 3, 2003, an HCJ physician failed to read the prior medical records and was unaware that Castro had been complaining of symptoms since December 4.  As a result, although the physician sent Castro to the LBJ Hospital, he failed to realize that Castro was suffering a stroke.  (Docket Entry No. 22, Castro's Response, p. 7).  Castro complains that the physician sent him to the LBJ Hospital with the wrong diagnosis.  (Docket Entry No. 22, Castro's Response, p. 7).

The summary judgment evidence shows that on January 3, 2003, Castro complained of numbness.  He was examined by a nurse, who referred him to a physician.  Castro told the physician that he had numbness and weakness in his right arm and right leg; he did not report headaches.  The doctor conducted a neurological examination, including right arm and right leg-raising tests.  Castro was found to have right-sided weakness.  As a result of this evaluation, Castro was transferred to the LBJ Hospital.  At the hospital, Castro was examined and received a CT brain scan.  The scan was negative.  Castro was discharged the same day and returned to the HCJ in the early hours of January 4, 2003.

The record does not support Castros' assertion that the HCJ nurse or physician was indifferent to his medical needs.  To the contrary, the nurse promptly referred Castro to the doctor who had him transferred to the LBJ Hospital, where he was examined, including through a brain scan.  It was only after the scan was negative that Castro was returned to the

jail.  The record contradicts Castros' assertion that he received no treatment at the LBJ Hospital except two pills.

### 6.    January 4, 2003

Castro claims that on January 4 and 5, 2003, he was left in a hallway and then a holding cell for hours, without treatment. The medical records contradict this assertion. On January 4, 2003, Castro was taken to the medical department and examined. On January 5, 2003, after he continued to complain of symptoms, medical personnel sent Castro back to the LBJ Hospital. The medical records do not reflect a long wait for medical attention. (Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 6, p. 2).

At the LBJ Hospital, Castro was diagnosed as having had a stroke. He remained hospitalized until January 8. At the hospital, he was prescribed medications, including some he had been prescribed at the jail, a special diet, physical therapy, and a walker. The Harris County Hospital District Emergency Room Triage Record shows that on January 3, 2003, Castro arrived in fair condition and complained of weakness in his arm and leg. Castro told staff that he had symptoms for three weeks but they were worse the previous day. The physician ordered a CT scan without contrast.

On January 4, 2003 at 12:30 a.m., the physicians at the LBJ Hospital ordered that Castro's IV be discontinued. Castro was discharged from the LBJ Hospital. (Docket Entry No. 17, pp. 157-58).

On January 4, 2003, at 1:35 a.m., a physician at the HCJ noted that Castro returned from the LBJ Hospital where he went for a CVA work-up at 5:30 p.m. on January 3, 2003. (Docket Entry No. 21, p. 2).   The physician noted that Castro had a CAT scan without contrast, and there was no evidence of a hemorrhage.   The physician told Castro to take aspirin, which Castro had done.   The physician noted that Castro had a boil on the right side of his neck.   Castro reported that the physician at the LBJ Hospital saw it but did nothing to treat it.   The physician noted that Castro had weakness on the right side of his body or right-sided hemiparesis.   The physician prescribed 500 mg Keflex twice a day for ten days.   The physician scheduled Castro for a follow-up on January 7, 2003 if the boil did not improve.

On January 4, 2003, a physician noted that Castro had right-sided weakness.   Castro had a history of hypertension, diabetes mellitus, and high cholesterol. (Docket Entry No. 21, p. 2).   The physician noted that Castro had been seen at LBJ Hospital on January 3, 2003, and the CT scan was negative.  The physician observed that Castro had right-sided weakness. The physician noted the strength in Castro's upper and lower extremities.   The notations apparently suggest that the HCJ physician informed the emergency room attending physician that Castro would be transported to LBJ Hospital because Castro had a CVA or stroke. (Docket Entry No. 17, p. 12).[5]

-------

[5]Although the record indicates that medical personnel made this entry on January 4, 2003, there is no indication as to the time of the entry.

On January 4, 2003, at 10:30 p.m. a nurse noted that Castro complained of numbness that was increasing in severity. Castro complained of pain in his chest and numbness on the right arm and right leg. The nurse recommended that Castro be taken to the clinic immediately. (Docket Entry No. 17, pp. 64-66).

On January 5, 2003, at 5:45 a.m., HCJ medical personnel made an Emergency Room transfer note. (Docket Entry No. 21, p. 2). The medical personnel noted that Castro had right-sided weakness. Castro had been seen at the LBJ Hospital ER on January 3, 2003 at which time he had a negative CAT scan. The medical personnel noted that Castro was presently unable to walk and was slurring words. The HCJ medical personnel asked the LBJ Hospital to evaluate and treat Castro.

Dr. Seale's affidavit describes his review of the medical records up to and including January 3, 2003.[6] The records showed that when Castro first complained of the symptoms that indicated he might be having a stroke, he was promptly evaluated by medical personnel at the HCJ and transferred to the LBJ Hospital for more extensive evaluation and treatment. (Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 6, p. 2). The records from LBJ Hospital showed that while Castro had a mild stroke, nothing in the records indicates that his stroke was caused by the medical treatment he received in December 2002

---

[6] Castro argues that Dr. Seale never examined his medical records, making Dr. Seale's testimony hearsay. (Docket Entry No. 22, Castro's Response, p. 11). Dr. Seale testified that he had reviewed the medical records of Juan Jose Castro while he was at the Harris County Jail and the medical records from LBJ Hospital. (Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 6, p. 2).

and early January 2003. Castro's long history of high blood pressure and diabetes caused the stroke, not the medical care he received the month before it happened. (*Id.* at 2).

### 7.    February 2003

Castro complains that in February 2003, he was refused physical therapy for his right arm and leg and was not provided with the correct medication for his blood pressure. He also complained that he was placed in general population for three months, where he had difficulty sleeping and receiving meals.

Dr. Seale testified that during the multiple physician evaluations following Castro's return from LBJ Hospital on January 4, 2003, he made no complaint of 'physical abuse' because of general population housing. The physicians continued to evaluate whether Castro needed to be admitted to the infirmary, which occurred on March 6, 2003. Castro remained in the infirmary until April 1, 2003. (Docket Entry No. 19, Sheriff Thomas's Motion for Summary Judgment, Ex. 6, p. 3). The record does not support Castro's claim of deliberate indifference to his medical needs.

### 8.    March 10, 2003

Castro complains that he was not given insulin until March 10, 2003, even after telling doctors that he had been taking insulin before he was incarcerated. (Docket Entry No. 22, Castro's Response, p. 12). The summary judgment evidence shows that on January 16, 2003, Castro told the physician that in the free world, he took 20 units of insulin daily. (Docket Entry No. 21, p. 3). The records show, however, that Castro received medications for his

diabetes shortly after he was admitted to the HCJ. He also received frequent evaluations of his blood sugar levels, and his medication was adjusted based on the results. The record does not support Castro's claim of deliberate indifference to his diabetic condition.

### C.     The Claims Against Sheriff Thomas in His Official Capacity

Castro's complaint states that Sheriff Thomas is sued "in his official capacity as Sheriff of Harris County." (Docket Entry No. 1, Complaint, p. 2). "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). A suit against a government official in his official capacity is the same as a suit against the entity the official represents. *Graham*, 105 S.Ct. at 3105. The claim that Castro has asserted against Thomas in his official capacity is a claim against Harris County, although Harris County was not named as a defendant. *See Bennett v. Pippin*, 74 F.3d 578, 584 (5th Cir.), *cert. denied*, 117 S. Ct. 68 (1996) ("A suit against the Sheriff in his official capacity is a suit against the County.").

The medical records show that the health-care providers at the Harris County Sheriff's Office were not deliberately indifferent to Castro's medical problems. Castro disagrees with the care that he received, but the Fifth Circuit has held repeatedly that mere disagreement with medical treatment does not state a claim for deliberate indifference to serious medical needs under the Eighth Amendment. *See Stewart v. Murphy*, 174 F.3d 530, 535 (5th Cir. 1999); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997); *Spears v. McCotter*, 766 F.2d

179, 181 (5th Cir. 1985); *Young v. Gray*, 560 F.2d 201, 201 (5th Cir. 1977). Although Castro alleges that the defendants were negligent and that the level of care he received constitutes "medical malpractice," these allegations are not sufficient to maintain an action under 42 U.S.C. § 1983. *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001), *cert. denied*, 534 U.S. 1136 (2002); *see also Stewart*, 174 F.3d at 534 ("[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not."); *Harris* v. Hegmann, 198 F.3d 153, 159 (5th Cir. 1999) (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)*; see also Farmer*, 511 U.S. at 835. Allegations and evidence of negligent failure to provide adequate medical care, or of a negligent diagnosis, do not show deliberate indifference. *See Wilson*, 501 U.S. at 297; *Stewart*, 174 F.3d at 534; *see also Domino*, 239 F.3d at 756 ("an incorrect diagnosis does not amount to deliberate indifference").

Castro offers no competent summary judgment evidence raising a fact issue as to whether defendants denied him adequate medical care while he was confined at the HCJ. Castro identifies no evidence showing that medical personnel at the HCJ "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Gobert*, 463 F.3d at ----, 2006 WL 2474846, *2 (citations omitted).

To prove an underlying constitutional violation in an episodic act or omission case, such as this one, a pretrial detainee must first show that an official acted with subjective

deliberate indifference. *Scott v. Moore*, 114 F.3d 51, 54 (5th Cir. 1997). Only then may he hold a municipality accountable for that due process violation. *Id.*; *Flores v. County of Hardeman, Texas*, 124 F.3d 736 (5th Cir. 1997). The present record does not show that HCJ officials acted with subjective deliberate indifference to Castro's serious medical needs. Nor does the record support an inference that Harris County had a custom, rule, or policy of deliberate indifference to detainees' constitutional rights. Rather, the evidence shows that Castro presented a complex medical history of both diabetes and high blood pressure. Castro's conditions were identified when he was admitted to the HCJ. He was evaluated on a continuing basis and his medications adjusted. Castro saw medical personnel frequently. Although he alleges delays in responses to his complaints, the record does not support these allegations. *See Grabowski v. Jackson County Pub. Defenders Office*, 79 F.3d 478, 479 (5th Cir. 1996) (per curiam) (en banc) (citing *Hare*, 74 F.3d at 649 n.4).

A municipality such as Harris County "can be held liable for its policies and customs that engender constitutional deprivation, but it cannot be held liable for the actions of its non-policymaking employees under a theory of respondeat superior." *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003). "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694); *see Cox v. City of Dallas, Tex.*, 450 F.3d 734, 748

(5th Cir. 2005).  There must be both municipal culpability and causation.  *See Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998).  "Culpability includes both the involvement of a municipal policymaker and affirmative municipal action."  *Piotrowski*, 237 F.3d at 578 n.17.  "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur."  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998)).

Castro has not shown a basis to hold Sheriff Thomas liable in his official capacity or to hold Harris County liable under section 1983.  First, Castro has not shown that the jailers and medical personnel at the HCJ or the staff at the LBJ Hospital were deliberately indifferent to his medical needs.  Second, Castro has not shown any basis to impose municipal liability.  Castro has identified a "policymaker" by suing Sheriff Thomas.  Although Castro does not explicitly identify Sheriff Thomas as a policymaker, under Texas law, a county sheriff has final policymaking authority over law enforcement.  *See Turner v. Upton County, Tex.*, 915 F.2d 133, 136 (5th Cir. 1990) ("It has long been recognized that, in Texas, the county sheriff is the county's final policymaker in the area of law enforcement . . .").  However, Castro has not alleged or identified facts that show an official policy or widespread pattern or practice that caused the alleged denial of medical care.  Even if Castro's allegations could be liberally construed as a claim of a custom of tolerating denials of medical treatment at the HCJ, Castro has failed to allege that Sheriff Thomas or other policymaker knew that such a custom existed and failed to correct it, through deliberate

indifference.   To the contrary, the record shows policies that detail requirements and procedures for responding to inmates' medical needs and the evidence shows that the policies were carried out.

Castro has not only failed to identify county officials who were deliberately indifferent to his medical needs, he has also failed to allege or identify facts showing an official custom or policy of Harris County as the moving force behind a denial of reasonable medical care to Castro.   The motion for summary judgment as to Castro's section 1983 claim against Sheriff Thomas in his official capacity and Harris County for the denial of medical care is granted.

D.     **The Claims Against Sheriff Thomas in his Individual Capacity**

The claims against Sheriff Thomas in his individual capacity are subject to a qualified immunity defense. "Government officials performing discretionary functions are entitled to qualified immunity from civil liability to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   The court first determines whether the plaintiff properly alleged the violation of a clearly established right. *Michalik v. Hermann*, 422 F.3d 252, 257 (5th Cir. 2005). "A right is clearly established if its contours are 'sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'" *Id.* at 238 (quoting *Wooley v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir. 2000)).   If the

plaintiff can meet that burden, the court then considers whether the official's conduct was objectively reasonable under the law existing when the incident occurred. *Id.* (citing *Sanchez v. Swyden*, 139 F.3d 464, 467 (5th Cir. 1998)).

A claim of denial of necessary medical care meets the first prong; the right to medical care in jail was established in 2002 and 2003. With respect to the second prong, Castro must show: 1) "objective exposure to a substantial risk of serious harm"; and 2) that Sheriff Thomas acted or failed to act with deliberate indifference to that risk. *Id.* at 345-46 (citations omitted). The record does not support an inference that Sheriff Thomas acted or failed to act with deliberate indifference to Castro's serious medical needs.

"For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Estate of Davis ex rel. McCully v. N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2001) (citation omitted). Section 1983 liability cannot be premised on respondeat superior. *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 286 (5th Cir. 2002) (citing *Doe v. Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994) ( en banc)); *see also Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) ("Under § 1983, supervisory officials cannot be held liable for the actions of subordinates under any theory of vicarious liability.") (citations omitted). To state a cause of action under section 1983, the plaintiff must allege facts reflecting the defendants' participation in the alleged wrong, specifying the personal involvement of each defendant. *Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir.

1992). A supervisory prison official such as Sheriff Thomas may be held liable for a section 1983 violation only if he either was personally involved in the constitutional deprivation or if there is a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Belt*, 828 F.2d at 304.

Castro has failed to allege or identify facts showing that Sheriff Thomas participated in the alleged wrongdoing. Without personal participation by an official, supervisory liability under section 1983 can exist only if the official "implement[s] a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Belt*, 828 F.2d at 304 (citations omitted); *see also Clark v. McMillin*, 932 F. Supp. 789, 790 (S.D. Miss. 1996) (in order to prevail on claim against sheriff in his individual capacity, plaintiff "must show that he affirmatively participated in acts that resulted in the alleged constitutional deprivation, or that he implemented unconstitutional policies that causally resulted in" injury). Alternatively, a supervisory officer not personally involved in alleged wrongdoing can be liable if he failed to train or supervise the officers involved, there is a causal connection between the alleged failure to supervise or train and the alleged violation of plaintiff's rights, and this failure to train or supervise constitutes deliberate indifference. *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001) (citations omitted).

Policies for health care services at the HCJ provided procedures for screening inmates on transfer to the HCJ; health assessments of inmates soon after entering HCJ; provision of

medical services to inmates; emergency medical treatment for inmates; and hospitalization of inmates. There is simply no evidence (nor does it appear that Castro is alleging) that Sheriff Thomas instituted a constitutionally deficient policy or that any such policy caused the alleged constitutional violations.

Castro alleges that Sheriff Thomas was responsible for the training and supervision of his staff. (Docket Entry No. 22, Castro's Response, p. 14). Castro complains that on January 5, 2003, prison guards told Castro that the doctor on duty was sleeping and would not see Castro. (*Id.*). Castro claims that the guards were acting according to a policy of not waking the doctor on duty even if an inmate was experiencing a medical emergency. (*Id.*). Castro does not provide anything other than a conclusory allegation that such a policy exists. The evidence shows that Castro received frequent medical care and that medical staff responded to his complaints. There is no evidence of a policy or custom not to waken doctors on duty if they are asleep when a medical emergency arose or that Sheriff Thomas was aware of such a policy and permitted it to continue.

Castro has failed to identify or offer evidence to support his allegation that Sheriff Thomas failed to hire adequate medical personnel or that he failed to train or supervise nonmedical personnel. Even if the guards refused to wake up the doctor to see Castro on one occasion, "[p]roof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." *Upshur Cty.*, 245 F.3d at 459 (citations

omitted).  A plaintiff making such allegations "must generally demonstrate at least a pattern of similar violations." *Id.* (citation omitted).  Moreover, the alleged inadequate training must be "obvious and obviously likely to result in a constitutional violation." *N. Richland Hills*, 245 F.3d at 381 (citation omitted).  Castro has utterly failed to make this showing.  Castro has failed to show that Sheriff Thomas has any personal or supervisory liability for the alleged constitutional violations.  Castro's claims against Sheriff Thomas in his individual capacity must fail.

## IV.    The Claims Against the HCJ and the Harris County Medical Department

Castro has named the HCJ and the Harris County Medical Department as defendants. (Docket Entry No. 1, Complaint, pp. 2-3).  Section 1983 imposes liability on any "person" who violates an individual's constitutional rights while acting under color of state law.  The capacity of an entity to sue or be sued "shall be determined by the law of the state in which the district court is held." FED. R. CIV. P. 17(b).  Under the applicable law, Castro cannot sue the HCJ or the medical department.

In *Darby v. Pasadena Police Dep't*, 939 F.2d 311 (5th Cir. 1991), the Fifth Circuit considered whether a plaintiff could sue specific departments of a city or county.  The court concluded that a complaint against a city's department, rather than the city itself, could not proceed if they were not political entities capable of suing and being sued. *See also Kirby Lumber Corp. v. State of La. through Anacoco-Prairie State Game and Fish Comm'n*, 293 F.2d 82, 83 (5th Cir. 1961); *Taylor v. Administrator of the SBA*, 722 F.2d 105, 110-11 (5th

Cir. 1983). The HCJ and Harris County Medical Department are administrative departments of Harris County, Texas, and as such, are not capable of suing or being sued. Castro's claims against the HCJ and the Harris County Medical Department are dismissed.

## V.    The Claims Against the Remaining Defendants

Castro has also named as defendants Dr. Lopez, Dr. Seale, LBJ Hospital, John Does #1-4, and Jane Does #1-5. (Docket Entry No. 1, Complaint, p. 3). When one defending party establishes that the plaintiff has no cause of action, as Sheriff Thomas has in this case, this defense inures to the benefit of other, similarly situated, defendants. *See Lewis v. Lynn,* 236 F.3d 766, 768 (5th Cir. 2001) (quoting *United States v. Peerless Ins. Co.,* 374 F.2d 942, 945 (4th Cir. 1967) (citations omitted)). The motion filed by Sheriff Thomas disposes of all the claims presented in the complaint. The court dismisses Castro's claims against the other defendants under 28 U.S.C. § 1915(e)(2)(B) as without an arguable basis in law.

## VI.    The State-Law Claims

A federal district court has supplemental jurisdiction over state-law claims that are so closely related to the federal-law claims within its original jurisdiction that they form part of the same case or controversy. 28 U.S.C. § 1367(a). The court may decline to exercise supplemental jurisdiction if it has dismissed the claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3).

This court has dismissed Castro's federal claims. The general rule in this circuit is to dismiss state-law claims when the federal claims they supplement are dismissed. *Parker &*

*Parsley Petroleum Co. v. Dresser Industries*, 972 F.2d 580, 585 (5th Cir. 1992). The dismissal of the supplemental state-law claims is without prejudice to permit refiling of these claims. *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999). This court declines to exercise supplemental jurisdiction over Castro's remaining state-law claims. Castro's federal claims are dismissed with prejudice. His state-law claims are dismissed without prejudice to refiling in state court.

## VII.   Conclusion

The motion for summary judgment filed by Sheriff Thomas, (Docket Entry No. 19), is granted. Castro's claims against Sheriff Thomas, the HCJ, the Harris County Medical Department, Dr. Esteban Lopez, Dr. Seale, LBJ Hospital, and Jane Does #1-5 and John Does #1-4, are dismissed with prejudice. Castro's state-law claims are dismissed without prejudice. Any remaining pending motions are denied as moot.

SIGNED on August 22, 2007, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge